The case for argument is 14-1686 Cambrian Science Corporation v. Cox Communications. The case for argument is 14-1686 Cambrian Science Corporation v. Cox Communications, Inc. So this appeal, all the issues relate to the phrase active waveguide coupler. The district court construed, at least in relevant part, this phrase to mean a component in which the absorption of an optical signal can be changed to gain by application of pumping. There are a number of problems with this. We think it should be reversed. For example, the words absorption, optical signal, gain, and pumping appear nowhere in the claim language. In addition... Well, I mean, I've not analyzed our claim construction cases, but I'd hate to think how many of those have a claim construction under Markman that might have words that aren't themselves in the claims. I mean, that doesn't get to the right. It does have the word active in the claim, right? Yes, ma'am. So one's got to figure out what that means. Yes, ma'am. And so another issue that we have with the district court's construction is with respect to limiting the scope of it to pumping only for gain. The specification teaches that there are other reasons that one might want to pump. For example, at column 8, lines 19 to 23, it does give gain as one option that you might want to pump. I'm not sure I'm clear on this. So are you saying pumping can go with passive? What I'm saying is that the district court's construction of limiting the active waveguide coupler to pumping only for gain is unduly limiting. It's excluding other embodiments and importing limitations from the specification. We're obviously avoiding Judge Post's question about active versus passive, which would seem to be critical here. Okay. Can I have the question again? Well, you're talking about gain, pumping for gain, so you're suggesting that passive is covered by this because it doesn't require pumping for gain? I'm not clear what your argument is. I'm not arguing that passive means pumping for gain. Okay. That's not our argument. My point is that the district court's construction is wrong because it's unduly limiting. It excludes other embodiments. Okay, which embodiments? Pardon me? Which embodiments? Okay, in figure, or I'll strike that in column 8, lines 19 to 23, this is where the patent gives examples of reasons that one might want to pump. Right. And what it says is that you might want to pump for desired gain. Okay? That's the one the district court cherry picked out and stuck into the claim. But it also says you might want to pump to provide desired pumping current, including leakage. You might also want to pump to provide desired heat load. How do you impart gain through pumping? Isn't that through providing current to the material? You've got to pump current into the active material, and by doing that, you impart gain in your optical signal? That is one way, yes. What else would you be pumping besides current? Well, it could be a voltage. It could be some sort of a change in temperature. You're pumping a change of temperature? Well, I think you're getting into maybe a question of what does it mean to pump. And, I mean, the patent clearly teaches here that there are other reasons that one might want to pump, other than just for gain. I'm sorry. I'm just trying to understand why aren't all of these items somehow all interrelated? Let's say you're pumping current to achieve a desired gain, and when you're pumping current into that material, the material is going to heat up some. I hear what you're saying, Your Honor, but what the— No, it's not like a menu of different choices of what you would do when you pump, whatever the word pump is. But that's what this passage from the specification does give you, is a menu. Well, I don't understand. Keep going. Keep reading. You gave us to line 23, but why don't you read the sentence starting at line 23, which says, whether a portion of the circuit of the present invention is pumped or not, that portion is formed of active material, so as to eliminate active to passive interfaces and the undesirable effects and costs associated therewith. Doesn't this form the basis for the district court's claim construction? This is one of the sections, I think. Well, I don't know that this— So this is what you've pointed us to, to try to prove your point that this embodiment isn't covered by the claim construction. I'm not seeing it when you read the paragraph in its entirety. I'm not seeing it. Okay. There were two questions in there, and I want to get to both of them. I appreciate it. So on the question of whether the district court pointed to this section to support its construction, the answer is no. Okay, the district court pointed to only two little specific pieces of evidence to support its construction. One of them was— Well, let's leave what the district court did. We're here on arguably some variation of de novo review. How do you construe the second sentence in the paragraph to which you called our attention? Okay, let's— What does that mean? Well, I think that this, again, is not with—is with respect to a specific embodiment, okay? And what it's really talking about is figure three, okay, which is the piece of prior art that shows the pileup of the transition between the active and the passive material. The jarring abutment is what we refer to it as. It's not just one embodiment. All over this patent is a statement to eliminate active to passive interfaces, and isn't that what the defendant uses, passive? Well, I think that gets into a question of what does passive mean. You know, that's not an issue that was litigated, and we didn't—you know, the experts didn't go into that question. This was all focused on the claim construction that we were given. And as we've explained in our brief, even if we go with the district court's claim construction, we still think that when you look at the component, the combination of the SOAs and the AWG, that it is a component in which the absorption of an optical signal can be changed again by application of pumping. What the defendants want to do is focus only on the AWG and say that portion of it can't meet the district court's construction. But what our theory is is that you look at the combination of the SOAs and the AWG. And if you look at the SOAs, we've made this point time and again, and the defendants haven't responded to it, is that the SOA piece of our component clearly meets that limitation. It is a component, that portion of it, in which the absorption of an optical signal can be changed again by application of pumping. Why would the SOA be part of the claimed active coupler when the SOAs and the Q's device are not joining together, combining together all these different lasers? All of that is happening in the AWG, which happens to be made of passive material. But keep in mind the location of the SOAs. You've got an array of lasers with light coming out. The light coming out of each laser goes through its own independent SOA. That's the piece of it that we say meets this third clause of the district court's construction. And then the light comes out of the SOAs and it's fed into the arrayed waveguide grading, the AWG, which is what the defendants call it. Which is the component that's doing all the combining of the individual lasers? That's the device that's doing the coupling. Well, what our theory is, it's the combination of the AWG with the SOAs that literally meets the claim language. Your patent, though, distinguishes SOAs, semiconductor optical amplifiers, from the couplers. It consistently describes those as two separate components. There's never any suggestion in your patent that those two should be somehow stuck together and deemed to be some kind of larger, functional, integrated component. Well, I think that if you look, for example, towards the end of the specification, for example, column 13, lines 43 to 45. Is this a boilerplate language? Well, this is not boilerplate. This is very specific. It's part of what I think patent lawyers would generally refer to as boilerplate at the end. But this is more than just boilerplate. This starts with what might be boilerplate. I mean, you could say, for example, at column 13, lines 29 to 31, it says, it is understood that the exemplary pick described herein and shown in the drawings represents only presently preferred embodiments of the invention. That may be what your honor is referring to as boilerplate language. But within that same paragraph, it goes on and gives some examples. And one of them that it gives is this clause that I was about to quote at line, column 13, line 43 to 45, where it says, Additionally, each channel of the active combiner may optionally have separate electrodes such that the gain of each channel is independent with respect to the gain of each other channel. That's specific. That's not boilerplate. And when you look at what the defendants did and you compare it to the prior art that was shown, recall all the prior art showed the SOAs over, it was a single SOA, at the output of the coupler. So it went laser, coupler, SOA. And what they've done in their products is they've moved the SOA over between the coupler and the lasers. They have the SOAs between the lasers and the coupler. And what they're doing essentially is exactly what's disclosed in that last paragraph that I just read. What they're doing is they're controlling independently each channel that's going into the coupler. That's exactly what's talked about here. Anything right there in column 13 about how in those instances it's okay to have active to passive interfaces? The phrase active to passive, I don't believe, is discussed in that last paragraph. You have a key rebuttal, so why don't you save that. Okay. Thank you. May it please the Court, Ruffin Cordell for defendants and appellees. I believe that the Court is focused on all the right issues here. The construction reached by the District Court for active waveguide coupler was in fact correct. Can I just ask you a more general question about the law and the legal standards applied here? There's a lot of discussion in this case about disclaimers. Our case law is pretty stringent in terms of disclaimers. My question to you is why we're talking about disclaimers in this case. Don't disclaimers go where there's claim language that covers it and then you have to clearly take it out? I would think your argument here would be the claim language says active. There's no reason to have necessarily a strict disclaimer in order for you to prevail in your claim construction. Precisely, Your Honor. We struggled with this at claim construction. So we actually presented many of what became our disavowal arguments at summary judgment as part of claim construction. But they didn't really have necessarily a precise home. So they were in support of our construction of active, that in fact it had to be active material, not passive material. But the disavowal of all active to passive interfaces per se wasn't core to the construction of active. And so we argued it. It was part of it. But it wasn't really until we got to the summary judgment phase that we added in the additional layer of disavowal. And as I've read the Court's cases, it's been very interesting in this particular matter. We sometimes treat disclaimer as a claim construction proposition and disavowal as an infringement proposition. And we certainly were not precise in the briefing, so I apologize about that. Because at summary judgment before the district court, we argued disavowal. And we relied very heavily on the Chicago Board of Exchange case, the CBOE case. And there the disavowal was used not necessarily as part of claim construction, but as an infringement analysis. So at that portion of the case. And that's really what happened here. When we briefed it, I think the appellant used the word disclaimer and we just parroted that back. But I don't think there's much of a difference. The legal standard is the same. It still has to be clear and unmistakable. And the effect is the same. You can't cover subject matter that you would have otherwise perhaps been able to, whether you've disclaimed it or disavowed it. So I'm not sure it makes much of a difference, but it is interesting. Let me ask you another question, which is, is there a Teva issue presented in this case? And, you know, kind of cuts the opposite way that you would assume generally, because you would be the people saying there ought to be deference to the district courts relying on an expert. But is that in play in this case? In a very small way, and it's just this, that we did present expert testimony at Markman. We relied on our expert, Dr. Koch, because we anticipated that the appellant was going to call their expert, and so we brought ours. The appellant, for whatever reason, decided not to, so only our expert testified. But he was sworn in. He did a tutorial. He was cross-examined. And essentially his opinion was that one of ordinary skill in the art would interpret the claims consistently with defendant suggestions for claims like the active waveguide coupler. The court did the analysis on the intrinsic record all the way through, and then at the end said, I recognize Dr. Koch, I think he was very credible, and I think his opinion is consistent with mine. And that's the full extent to which it was won. So this is a case about intrinsic record? I believe that's right, and I think to the extent there are any doubts in the court's mind and resort has had to extrinsic evidence in that case, then Teva would say that we need to give the court's findings with respect to Dr. Koch evidence. But it's a small, small issue. Okay. I've distracted you so far, so why don't you talk, bring us back to this case, and if you could, in your discussion, refer to what your friend called our attention to on column 13. Maybe start with that. Sure. So he referred to that as sort of the boilerplate plus, which I think is probably accurate. But what we have to do is we have to read it very carefully. So what it's talking about here is that you can provide an SOA on each channel. Therefore, you can amplify using control on each channel. It says nothing about whether that SOA is somehow combined with a coupler, and in fact I would argue it says just the opposite, that in order to have an SOA that you can control for each channel, it cannot be combined with a coupler, because then amplification is integral to all of the channels that are going through the coupler. So this passage at 13 lines, so I guess it's about 42 through 48, I think actually cuts in favor of defendants, of Applees here, because it actually says that this SOA is separate from the combiner to allow you to have this individual control. The court also asked questions about pumping, and I think my opponent suggested that pumping was used for various purposes, and I'd like to address that if I could. If we go back to the specification, we see that it does discuss pumping, and it tells us why you pump, and the place I'd like to start is column 7, line 62, and there it tells us, so it's discussing the MMI coupler, which is one of these active waveguide couplers, and it says the MMI coupler of figure 6 is optionally pumped substantially over the entire region thereof. In this manner, maximum gain may be obtained. So when you really need to turn up the volume, because you're pushing a signal out over long, long distances, you pump the entire thing. But then it says, and these are the sections that the appellant keeps pointing to over and over again, at the top of column 8, so beginning at line 9, it says those skilled in the art will appreciate that pumping or current injection can occur at various different portions of an active device. The gain, the pumping current, including any leakage current, and the heat load can be controlled to some degree by pumping only selected portions of an active device. So if you want maximum gain, you pump the whole thing, but if you're worried about heat load and leakage current, which are actually unwanted side effects of pumping, Judge Chen, you're exactly correct. They inject current into these things in order to give them the ability to amplify the signal, and that has unwanted side effects. It heats it up, and you have leakage current that might bleed into other portions of the circuit that you don't want. And so what the passages in column 8 there and then again at 13 through 16 are talking about are managing the unwanted side effects. It's not a menu of options. Anytime you pump the circuit, you're going to have heating. Ohm taught us that. Anytime that you put current into a very small semiconductor structure, you will have leakage current. That's a physical fact, and this is talking about managing that process, not that you would ever want to have those unwanted side effects. So that really is a technical, it's just not correct. There was also some discussion about the disclaimer. So if I could just touch on that briefly. Now I've done it. It's disavowed, not disclaimer. The thing that I think is remarkable about this case is not just the breadth of the repeated statements about the lack of active-to-passive transitions, but it's set up in the patent that there is a fundamental problem here with active-to-passive transitions. We have problems in alignment at column 2, 20 through 28 in manufacturing in that same passage. The time and expense required to make these active-to-passive transitions at 2, 33 through 37, and then most importantly at 2, column 2, 41 through 48, it talks about these unwanted reflections, that any time you have that active-to-passive transition, the discontinuity causes the signal to reflect off of the discontinuity, much like you appearing at your image in a pool. The change in the index of refraction causes some of the signal to bounce right back out at the laser, and that's a big, big problem. They then propose a solution, and we see it at the juxtaposition of figures 3 and 4, which is reproduced at page 8 of our brief. And it shows you that they have replaced the active-to-passive transition with an active-to-active transition. And then every single figure thereafter that talks about the prior art and the invention, and these structures are side-by-side, so I commend them. They're at pages 7, 8, and 9 of our brief, but figures 1 and 5 are compared. The only difference is the removal of the active-to-passive transition. Figure 1 is prior art, figure 5 is the invention. At page 8 of our brief, figure 2 and figure 6 are presented. Figure 2 is prior art that has the active-to-passive transitions, figure 6 does not. At page 9 of our brief, we have figures 8 and 9 and figures 10 and 11. In every single disclosed embodiment, the only difference between those drawings is the removal of those active-to-passive transitions. Is your device, the AWG, passive? It is, Your Honor. Is it passive material? It is, and that was reflected in the deposition of Dr. Duda. So do you have those unwanted reflections at the junction? We do. Do you have pile-ups at the junction? The pile-up was a new argument they raised on appeal, so that actually wasn't litigated. Our manufacturing process is very good, so we try our best to avoid pile-ups, but we do have the butt joint, and you'll see it at page 12 of the red brief You can see that there's a laser at the top of the diagram, and then the SOA is below it, and then there's something called the butt joint, and that butt joint is that active-to-passive interface. There's then a passive waveguide, a series of optical wires, if you want to call them that, that take the signal and transport it all the way across the circuit to the AWG, to what they've accused is the coupler, and it's undisputed that that is a passive device, and we have that at A9088, the testimony of their export process. At certain points of this patent, it appears to make clear that they aren't seeking to definitively, for all times, remove any kind of interface between active and passive in their photonic integrated circuit, right? There's words like you're mitigating them, or you're substantially removing passive regions, so there's some play in the joints, it feels like, in this patent. I saw those as well, Your Honor, and the best that at least we interpreted as we were going through the case is that perhaps what they were referring to, because they don't really tell us, but perhaps what they were referring to is the fact that these are integrated devices, so they are etched in the way the court is familiar with the way semiconductor memory or microprocessors are etched and laid out using dopants, and so there are anomalies in the manufacturing process, so you could easily see that within an active region, there's a region that didn't get enough of the doping to make it fully active, and so you could have some passive material, and that's really the way I read the patent's discussion of it. With respect to the mitigation point, they tell us at the bottom of column six, I think, that they expect that while removing the active to passive interfaces goes a long way to solving the problem. They acknowledge, beginning at about, well, 62, referring now to figure four, according to the President mentioned, an interface between two active regions, 60 and 62, does not create such large undesirable reflections. The reflections caused by the interface 59 are negligibly small, so they acknowledge that even in the active-to-active case, you might still have some reflections, but they're negligibly small, and so they have mitigated it by removing the passive-to-active interfaces, and that's how I wrote that. If I can make one last point, Judge Shin, you asked about whether we could treat this red box where they take the SOA and combine it with the AWG, and the one thing I'd like to say about that is, first, the disavowal falls squarely in this. I mean, they are essentially vitiating their disavowal by drawing that red box, but more than that, they rely heavily on the Toro case, and one of the teachings of the Toro case is that you may be able to take a single claim element and divide it between two structures, but where it is a key objective of the invention, then that's really not allowed, and that's what they're doing here. So the amplifier existed in the prior art. It's in Figure 1. They've got the SOA, they've got the combined or the coupler as two separate elements. It is treated as separate elements throughout the specification. The SOA is utilized and it's claimed individually in Claim 58, which depends from Claim 57, and so on balance, I think they really can't take those two elements and somehow try to mix them together. What about the other side's expert supplemental declarations? Do you still believe that the entire declaration was stricken? It was not. There were only certain paragraphs that were stricken. The place where that issue falls is on the DOE. I should rely on the Gray Brief for that thing? Well, I caution you. What they represent in the Gray Brief is that there were, I believe, six paragraphs that they cited from their expert's declaration that they said, again, bore on the doctrine of equivalence issue. There were two paragraphs that were never stricken that, in fact, talk about doctrine of equivalence, but it's just parroting the standard, function, way, result, or insubstantial differences. There's no analysis. There's no precise testimony or linking argument. It's just the boilerplate. The other paragraphs that are cited in the Gray Brief are actually speaking to literal infringement, and as the Court is well aware, DOE is not a lesser included offense to literal infringement, and so they can't rely on the paragraphs that survived the motion to strike about literal infringement to try to support their DOE show. Okay, thank you. Okay, there was a lot there. Let me just start, if I may, with this last point about the doctrine of equivalence, because the defendants would leave the Court to believe that there were only two paragraphs in those expert declarations that bore on the doctrine of equivalence, and that's wrong, as we explained in our brief. I want to direct the Court's attention, for example, to paragraph 182. It's in the record at A7990, and what it says is, quote, SOAs are used at the input side of the active coupler to amplify the optical power in its respective channel feeding into the AWG section of the coupler. In this way, the SOA and the coupler are a single functional component. That's not conclusory evidence. That's detailed expert opinion that just so happens to be linking in with that last clause in the boilerplate plus, is what Mr. Cordell called it, which is you put the SOAs in between the lasers and the coupler, and you control the gain through each electrode going in there. So there is some detailed testimony in the expert disclosures on that issue. On the SOA issue, I believe I heard Mr. Cordell say that at the bottom of column 13, that section said that SOAs are separate. This goes to Judge Chin's point earlier. That's not what that says in that section. It doesn't mention that SOAs are separate components. In fact, during claim construction, the defendant attempted to get a construction of SOA that the SOA had to be distinct from a coupler, and the district court rejected that construction. On the issue of disclaimer, I heard what the chief judge said about this court's case law being stringent. I agree with that. It's an exacting standard. It has to be clear and unmistakable. And I heard that Mr. Cordell said they struggled with this issue at Markman. So as a practical matter, this issue was not brought up during Markman. We were given a claim construction. We prepared the case based on that construction. And then at the end of the case, as we're going into summary judgment briefing, the issue of disclaimer in all these cases pop up for the first time. And we get an adjustment, in my opinion, from the district court on his claim construction when he said that at the top of this is in the MSJ order, page 41 of it. It's in the record at A71. What the district court said is all that is required is the absence of active to passive transition within the signal path of the active waveguide coupler. That's kind of a gloss or an interpretation by the district court of its own construction. We didn't have the benefit of that while we were going through the case. So here we are. The case is getting decided against us. We're going out the door, and we're given this new construction that we never had before. Did you have an opportunity to brief it during the summary judgment briefing? It was never argued. What, this point about whether or not there was a disclaimer or disavowal in your specification, that was never argued or presented in any of the briefings? It just popped up the first time in the summary judgment decision? Well, no, disclaimer was argued. They made the point for the first time in their summary judgment briefing. They argued for a complete disclaimer, all disclaimer. Right, and did you then respond to that in your briefing? Yes, we did. So you did respond to it. We didn't respond to what the district court said here because we had no idea. This argument was never presented. There was never an argument made by the defendants that said this claim construction should mean all that is required is the absence of active to passive transitions within the signal path. That argument was never made. We never had any notice of it. We didn't get any notice of that until we got the MSJ work. And so that is why we feel like we were denied due process. We didn't have notice of that. We didn't have a meaningful opportunity to respond to it. Okay. We have your arguments. We thank our counsel. The case is admitted. That concludes our proceedings for this morning. Thank you.